**In re Anonymous No. 11 D.B. 82**

Disciplinary Board Docket no. 11 D.B. 82.

SCHWARTZMAN, *Member*, April 10, 1987 — A petition for discipline against [  ], Esq., (respondent) was filed on February 25, 1982.

The matter was assigned to Hearing Committee [  ] after which 12 hearings, for the presentation of evidence on the merits, were held from June 3, 1982 until February 21, 1984. A total of 1,600 pages of testimony were taken.

On October 31, 1985, the hearing committee found respondent's conduct evidenced violations of the Disciplinary Rules of the Code of Professional Responsibility.

Petitioner and respondent were given the opportunity for additional hearings at which time evidence bearing on the type of discipline to be recommended might be presented. The committee met in further hearing for that purpose on December 3, 1985, at which time an additional 190 pages of testimony were taken.

## SUMMARY OF THE CHARGES

### Charge I

Respondent was charged with having received three fees from clients of the law firm of which he was a partner, to wit, the [A]/[B] fee in the sum of $5,000, the [C]/[A] fee in the sum of $1,250 and the [D] fee in the sum of $434.75, and with thereafter having failed to deposit and maintain the funds in an account maintained for the funds of the law firm and then with having converted the said funds to his own uses and purposes.

### Charge II

Respondent was charged with having engaged in a course of misrepresentation and deceit in an effort

to disguise his receipt and conversion of the [A]/[B] $5,000 fee.

## Charge III

Respondent was charged with receipt of the sum of $1,701.33, a fee which the law firm claimed for representation and legal services rendered in the [E] workmen's compensation case, and with thereafter having failed to maintain those funds in an account maintained for the funds of the law firm and then with having engaged in acts of misrepresentation and deceit and with respect thereto after converting said funds to his own use.

## Charge IV

Respondent was charged with having received from the [Fs], a firm client for whom respondent did a great deal of work, the sum of $50,000, paid for legal services rendered and then of having failed to deposit the said $50,000 in the firm account and/or to account to the firm for the monies received.

## Charge V

Respondent was charged with having received and retained for his personal use the sum of $500, which was part of a $3,000 fee the firm claimed for services rendered in respondent's having managed, on behalf of the law firm, a personal injury action on behalf of [G].

For each of the alleged violations, respondent has been charged with breaching the following disciplinary rules of the Code of Professional Responsibility:

(a) D.R. 1-102(A)(3): A lawyer shall not engage in illegal conduct involving moral turpitude;

(b) D.R. 1-102(A)(4): A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(c) D.R. 1-102(A)(5): A lawyer shall not engage in conduct that is prejudicial to the administration of justice; and,

(d) D.R. 1-102(A)(6): A lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law.

## FINDINGS OF FACT
### *Charges I and II*

(1) In or about April 1972, respondent became an associate of the law firm of [H], [I], and [J]. On November 6, 1975, a partnership agreement was entered into by and between [H], Esq., [I], Esq., [J], Esq., [K], Esq., [L], Esq., [M], Esq., [N], Esq., [O], Esq., and respondent.

(2) Under the terms of the aforementioned partnership agreement no partner was permitted to personally retain the proceeds of any fees which were paid by clients of the firm, and all fees were to be provided to the firm, following which each partner was paid his proportionate share of the profits of the firm, under the terms of the partnership agreement.

(3) On or about October 9, 1975, [Mrs.] and [Mr.] [A] were injured when the automobile in which they were riding collided with a vehicle that was being operated by one [P]. At the time of said accident the [A's] vehicle was insured by the [Q] Insurance Company, and [P's] vehicle was insured by [R] Insurance Association.

(4) As a result of the aforementioned accident [Mr. A] was arrested and charged with involuntary manslaughter, and pursuant thereto he consulted [S], Esq.

(5) In or about the early part of 1976 [S] referred

the [A's] to respondent and the firm, and pursuant thereto respondent advised [Mr. A] that the firm's legal fee for representation on the criminal charges would be $2,000.

(6) On or about May 17, 1976, [A's] daughter, [B], paid respondent $750 towards his quoted fee of $2,000, for the firm's representation of her father on the criminal charges, which respondent turned over to the law firm's bookkeeper and office manager [T]. On or about May 25, 1976, [Mr. A] was found "not guilty."

(7) On or about June 4, 1976, [B] executed a contingent fee agreement and retained the law firm to represent her as guardian of the estate of her mother, [Mrs. A], an alleged incompetent, to pursue a claim against [P] and [Mr. A] as a result of the injuries [Mrs. A] sustained in the aforementioned automobile accident.

(8) By a bill dated June 8, 1976, [Mr. A] was notified that he still owed the law firm $1,429.90 for representation on the criminal matter.

(9) In or about the end of 1979 respondent negotiated a settlement in this lawsuit on [B's] behalf, whereby [Q] agreed to pay [B] $100,000 and [R] agreed to pay her $5,000. By an order dated January 7, 1980, this settlement was approved by the court, along with a counsel fee of $34,810.45 (representing one-third of the proceeds of said settlement).

(10) By letters dated January 9, 1980, respondent requested that the attorneys for [Q] and [R] provide him with the appropriate checks in satisfaction of this settlement, and that the checks be made payment to [B] and him as her attorney.

(11) On or about January 16, 1980, [U], Esq. forwarded to respondent [R's] share of the proceeds of settlement, in the amount of $5,000 by way of a check drawn as respondent had requested. Upon receipt of said check on or about February 2, 1980,

respondent forwarded it to [B] for her endorsement, along with [Q's] check in the amount of $100,000, which had also been provided to respondent.

(12) Upon her receipt of the aforementioned checks [B] endorsed them, as respondent had requested, and returned them directly to respondent.

(13) Upon his receipt of the endorsed [Q] and [R] checks on or about February 23, 1980, respondent endorsed and delivered the [Q] check to [T] along with the following written instructions as to how the proceeds of the [Q] check should be disbursed:

| | |
|---|---|
| [B], Guardian of [Mrs. A], Incompetent | $69,725.43 |
| [S], Esq. | 11,603.48 |
| The Law Firm Costs | 464.12 |
| The Law Firm Fee | 18,206.96 |

(14) Respondent directed [T] to distribute to the firm a fee which was $5,000 less than was due the law firm under the terms of the contingent fee agreement which [B] had executed.

(15) On or about February 26, 1980, respondent sent [B], inter alia, a bill for $1,250, which represented the remaining portion of the fee which was due and owing the firm as a result of respondent's representation of [Mr. A] on the criminal charges.

(16) In or about the latter part of February 1980 one of respondent's partners, [K], discovered that respondent had received both the [Q] and [R] checks, and that they had been endorsed by [B], but that thereafter only the [Q] check had been turned over to [T].

(17) By a check dated March 28, 1980, [B] forwarded the remaining portion of the fee, in the amount of $1,250.

(18) On June 5, 1980, it earlier having been discovered that the [R] check had been received,

respondent's partners decided to confront him with what they knew about the missing $5,000.

(19) During the course of the aforementioned June 5, 1980 confrontation, respondent admitted to his partners that he was consciously and willfully withholding fees due and owing the law firm, as a result of his previous decision to leave the law firm, in order to build a fund to serve as capital or money for opening his office, and as a fund from which to negotiate the terms of a severance of his relationship with the law firm.

(20) On or about June 16, 1980, respondent provided the firm with $1,684.80, a portion of which represented the $1,250 fee due and owing the firm from [Mr. A] on his criminal matter.

(21) On or about June 17, 1980, respondent provided the firm with an additional $5,000, which represented the remaining portion of fee due and owing the law firm under the terms of its agreement with [B] in its representation of her as the guardian of her mother.

(22) In or about October, 1978, [D] retained the firm to prepare an estate plan for him. The legal services on this matter were performed on behalf of the firm by respondent.

(23) Following the completion of this legal matter the firm issued a bill to [D] dated January 8, 1980, for services rendered, in the amount of $434.75. Respondent placed, or caused to be placed upon this bill the notation "please make your check payable directly to [Respondent], Esq.," to insure that the fee would be provided directly to him, and not the firm.

(24) On or about January 10, 1980, [D] remitted payment of this bill directly to respondent, by forwarding to him his check in the amount of $434.75, which represented the fee of the firm for services rendered to [D]. Upon receipt of $434.75 respon-

dent failed to advise any firm member of his receipt of these funds, failed to deposit and maintain said $434.75 in an identifiable bank account or an account maintained for the firm's funds, and failed to provide said $434.75 to the firm.

(25) On or about March 28, 1980, [T] accidentally discovered that the aforementioned bill for services rendered in the amount of $434.75 had been issued to [D], but that there was no law firm record of the bill having been paid.

(26) Thereafter [T] brought to the attention of [M] and several other partners the fact that the afore-mentioned bill had apparently not been paid, and as a result thereof, and in or about June 1980 [M] telephoned [D's] wife and inquired as to why the firm's $434.75 bill for services rendered in estate planning had not been paid. In response thereto she forwarded to the firm an additional $434.75.

(27) Thereafter [D] recalled that he had already paid this bill, so advised [M], who sent to him the firm's check in the amount of $434.75 on June 16, 1980.

(28) On or about June 16, 1980, respondent provided the firm with $1,684.80, a portion of which represented the $434.75 fee. (See also Finding of Fact 19, *supra*.)

## *Charge III*

(29) On or about November 15, 1978, [E] was injured while working as an employee of the Pennsylvania Department of [V], following which [E] filed a claim for workmen's compensation, which was ultimately rejected.

(30) As a result thereof [E] consulted with respondent, and on or about February 6, 1979, [E] executed a contingent fee agreement and power of

attorney and retained the law firm as his attorneys to prosecute his claim for workmen's compensation.

(31) Thereafter various workmen's compensation hearings were held before referee [W]. By order dated March 12, 1980, referee [W] found that [E] had been totally disabled from November 15, 1978, up to an including June 11, 1979, and that he was entitled to compensation for a period of 29 and two-fifths weeks.

(32) [W] also ordered [V] to reimburse [E] for various costs and expenses, and he directed that: "Counsel fees are to be paid to [H], [I] and [J] in the sum of $1,701.33 out of the compensation awarded to the claimant."

(33) Pursuant to referee [W's] order, and by a check dated April 16, 1980, the Commonwealth of Pennsylvania provided respondent with $1,701.33, representing the firm's legal fee in this matter.

(34) Upon receipt of the firm's $1,701.33 fee, respondent failed to deposit and maintain said $1,701.33 in an identifiable bank account, or an account maintained for the firm's funds, failed to advise any member of the firm of his receipt of these funds or to provide said $1,701.33 to the firm.

(35) In or about the end of April 1980, [O] discovered that respondent had received the afore-mentioned [E] workmen's compensation check from the commonwealth, which he brought to the attention of various members of the law firm.

(36) Upon being advised by [O] that the [E] check had been received by respondent but that it had not gone through his law firm's bookkeeping system [J] determined that the [E] check had been negotiated by respondent.

(37) [J] thereafter brought to his other partner's attention what he had learned regarding the [E] workmen's compensation check and the fact that

respondent had negotiated it, but that the funds had not been turned over to the law firm. Upon learning of this respondent's other partners decided to confront respondent on June 5, 1980, with the fact that the $1,701.33 was missing, and with what they had learned.

(38) On or about June 5, 1980, various members of the firm confronted respondent regarding his apparent misappropriation of the firm's $1,701.33 fee, and demand was made upon respondent for these funds. Respondent engaged in a course of misrepresentation in an effort to disguise his previous conversion of these funds.

(39) Following the aforementioned June 5, 1980 meeting, respondent contacted [X], Esq., in furtherance of the misrepresentation that he was attempting to perpetrate upon the firm, and he asked [X] if he would do him a favor. He falsely advised [X] that his (respondent's) secretary, [Y] was being accused by the law firm of misappropriating various checks, one of which involved the $1,700 fee from a workmen's compensation case on behalf of [E].

(40) Respondent advised [X] further that he had seen the check, that it had been cashed, and that it looked like [Y's] signature on the back, and he asked [X] if he would be willing to issue a check in the amount of $1,000 to the law firm.

(41) All of the aforementioned statements by respondent were false, since at no time had any member of the law firm indicated that they suspected that [Y] had misappropriated the $1,701.33 or stolen the [E] check, and in light of the fact that respondent had previously converted the entire $1,701.33 to his own uses and purposes, and respondent elicited [X's] assistance in furtherance of his attempts to disguise his previous conversion of the firm's funds.

(42) [X] agreed to assist respondent in his scheme, and pursuant thereto he issued a check payable to the law firm in the amount of $1,000, which he mailed to respondent that day with a cover letter wherein he stated, inter alia, "Enclosed please find a check for $1,000 which represents the firm's portion of the $1,700 fee on a workmen's compensation case on behalf of [E]."

(43) [X] had never in fact represented [E] on this workmen's compensation matter, he had never heard of [E] up to that point, and he was not due a $700 fee regarding said matter.

(44) Following his receipt of [X's] letter and the check which he had requested of [X], respondent made a number of false statements to the members of his firm with respect to [X's] alleged involvement in the [E] case and his having referred the case to respondent.

## Charge IV

(45) Prior to respondent's joining the firm, the firm was retained by and represented [   ] and [   ] [F], [F] Brothers Leasing Inc., and affiliated corporations and businesses of the [Fs'] regarding various legal matters in which the [Fs] were involved.

(46) In or about 1973 the firm assigned most of the [Fs'] legal matters to respondent for his consideration, prior to which the [F] matters were handled by [H], Esq. who retired from the firm on December 31, 1975, and died on May 29, 1976.

(47) Between 1973 and June 4, 1979, the [Fs] were issued bills for services rendered by the law firm, for legal work performed by respondent and other members of the firm, on legal matters which included, inter alia, the [Z] Mall matter and the [AA] Bank matter.

(48) On or about June 4, 1979, the [Fs] prepared two checks — one payable to "[H], [I] & [J]" in the amount of $67,262 and the second payable to respondent in the amount of $40,000.

(49) The $67,262 check was provided to the firm.

(50) Respondent retained the $40,000 payable to him treating it as a retainer which under the terms of the partnership agreement the partners, to whom retainers were paid, were entitled or permitted to retain individually, as opposed to fees received for services rendered which became and were the property of the firm.

## Charge V

(51) On or about July 9, 1976, [G] was injured when he was struck by an automobile that was owned and being operated by [BB].

(52) On or about August 4, 1976, [G] consulted and retained the law firm to represent him in taking any action necessary to obtain compensation for him for the injuries he sustained as a result of said accident, and pursuant thereto [G] executed a contingent fee agreement which provided, inter alia, that the law firm would receive a legal fee of 25 percent, 30 percent or 33 and one-third percent of the proceeds of recovery.

(53) Respondent was the member of the law firm who represented [G] in this matter, and pursuant thereto he negotiated a $10,000 settlement on [G's] behalf.

(54) In accordance with the terms of settlement, and in or about November 1977 [BB's] insurance carrier, the [CC] Insurance Company forwarded to respondent its check for $10,000, which was endorsed by [G] at respondent's request, while he was in respondent's office on or about November 25, 1977.

(55) Under the terms of the contingent fee agreement which [G] executed the firm was entitled to a fee of $3,000. Respondent prepared, or caused to be prepared a distribution sheet which reflected a firm fee of $2,500, and respondent directed [T] to prepare two checks payable to [G] on November 25, 1977 — one in the amount of $6,882.90, and one in the amount of $500.

(56) Following the preparation of the aforementioned checks respondent signed them and on or about November 25, 1977, respondent provided the $6,882.90 check to [G], but he advised [G] that he ([G]) owed the law firm an additional $500 fee, with a request that [G] cash the $500 check and return those funds to him (respondent) which he did on that same day.

## DISCUSSION

In early 1980 respondent made a tentative decision to withdraw from the law firm and engage in practice as a sole proprietor after eight years of conscientious devotion and work as an associate and a partner. Respondent's devotion to the profession and his skill are unquestioned. His abilities resulted in an unprecedented and rapid rise to the status of partner in the firm, and finally a senior partner in 1977. His contributions to community affairs are extensive.

During his years with the firm, [respondent] generated substantial income for the firm, always bringing in more than he withdrew. This reached an apex in 1979, when his efforts produced approximately $150,000 in fees. He received approximately $55,000 from the firm. As a result of this disparity, one of the partners, [M], recognized respondent's inadequate compensation and offered

respondent, in December 1979, his share of a 10-percent holdback which the firm annually retained to reward deserving individuals. Other members of the firm were antagonistic to such a proposal and insisted on an equal share of this reserve even though they had produced far less income for the firm than [respondent].

Respondent's competence was also recognized by the fact that he was personally assigned the responsibility for handling the affairs of the firm's most significant clients, as well as the most important civil litigation.

In order to enhance his bargaining position during the anticipated negotiations which would accompany his separation from the firm, respondent directed his secretary to begin withholding certain checks as they arrived until approximately $8,000 was accumulated. Respondent thought this amount would be the approximate sum due to him as the combined total of his partnership draw and capital accounts at the time of his separation. The firm's bookkeeper ultimately concluded that respondent would have had $6,300 in firm accounts to which he would have been entitled upon separation. This is not a substantial deviation from respondent's own estimate of $8,000 as the sums due to him.

The decision to leave the firm having been established in his mind, respondent directed his secretary to begin withholding various checks from the firm's bookkeeper until the $8,000 was accumulated, and to turn in to the firm subsequent checks after that plateau was reached. Respondent's motives may have been ill-advised, to protect his own best interests, but they were not devious, criminal or a violation of the Canons of Ethics.

[Y], respondent's secretary, explained that in January 1980 respondent called her into his office and

told her that events at the December 1979 annual meeting of the partners had solidified his decision to leave the firm.

Respondent had become disillusioned with the manner in which the firm conducted its affairs and rewarded his efforts. He consistently found himself out-voted in his proposals of partnership meetings. It seemed inequitable that some partners should spend valuable firm time on matters for which they received personal reward, rather than devoting that time to matters which benefited the firm as a whole. This, combined with the fact that respondent contributed significantly more to the firm's profits than he withdrew as his distributive share, added to his disturbance. It bothered him that some partners withdrew as much or more as income from the firm even though they produced far less in terms of billable hours and gross income. In addition, respondent had received information which led him to conclude that another partner had personally received stock from a client which had great potential value. The receipt of this valuable stock was not disclosed to the firm.

All of these events contributed to respondent's direction to his secretary to withhold various checks as they arrived. He never gave her any specific instructions as to which checks should be withheld. He had no idea which checks were in fact being withheld and he kept no list.

An unanticipated series of events later led to three of these checks (the $5,000 [A] settlement check; the $1,250 [A] fee from the criminal action; and the $434.75 [D] check) being inadvertently deposited into respondent's personal checking account rather than being retained in a binder maintained by his secretary as he had directed.

The circumstances surrounding the partners' dis-

covery of the deposit of the $5,000 [A] check, and respondent's attempt to explain, demonstrate the confusion in respondent's mind as to what actually had transpired. Respondent's attempts to reconstruct past events, upon being confronted by some of his partners, demonstrate nothing more than normal human confusion intensified by their hostility and their unfounded accusations.

The partners, excluding respondent, held several meetings in May 1980 to discuss the situation. It was decided that [I] and [J] would confront respondent.

It is this background which led up to the confrontation between respondent and the other partners on June 5, 1980.

On June 5, 1980 everyone believed that respondent had cashed the $5,000 check in [DD] and respondent was, therefore, accused of having cashed it there. Respondent replied that he had not been in [DD] and if it was cashed there, his signature was a forgery. As soon as respondent was shown the check, he admitted that it was his signature.

[Respondent] testified that he knew there had to be an explanation for the $5,000 check because he had never been in [DD]. He just did not know what it was although he freely admitted to the parties that he had been having his secretary withhold certain checks.

At this June 5, 1980 confrontation, respondent was also asked about the $1,700 [E] check. Unlike the $5,000 [A]/[B] check, which totally befuddled respondent as to its whereabouts, he felt he could explain the whereabouts of that check. He informed the partners that the [E] check was at home in his briefcase. That was where he said he last recalled seeing it. Respondent said he was totally surprised when he could not locate the check in his briefcase and he therefore assumed that it must be in a locked desk drawer, to which only his wife had a key.

Immediately after the confrontation with the other partners on June 5, 1980, respondent called his secretary into his office and spoke with her. As soon as she left respondent's office, [N] spoke to her and she informed [N] respondent had accused her of losing a check. The secretary told [N] she was going to hunt for it but she suspected it was respondent who had himself lost it.

[Y] left the office terribly upset. She went home and cried, telephoned her fiance, and went with him on a trip to [EE]. She remained unavailable for any communication from Thursday, June 5, 1980, until Monday, June 9, 1980.

Her absence caused respondent to come up with an explanation that is difficult for this board to fathom. He said he became convinced that the firm suspected his secretary of having stolen the checks, perhaps in complicity with her fiance, because she had been having personal problems of a financial nature for several years. He further explained that since [Y] had gone into seclusion and was unavailable to explain her lack of participation in the disappearance of the checks, respondent believed that the firm suspected her since she had apparently been sent home by [N]. He further stated that additional factors such as she had access to the checks, and she had a fiance who was an over-the-road truck driver who could have cashed the $5,000 check in [DD], further convinced him of her possible complicity.

Although the partners had both checks, they only showed him a copy of the $5,000 check. They did not show him the $1,700 [E] check. He testified that he somehow concluded that [Y] and her boyfriend were involved.

Respondent explained his thinking as follows:

He knew that his secretary had been holding

back checks. He admitted this to the firm during the June 5, 1980 confrontation. He had no idea that the $5,000 check was one of the checks being withheld, but he was informed that the check had been cashed in [DD]. His recollection of the $1,700 check was initially more precise. He knew there had to be an explanation for the $5,000 check because it was clear he had not been in [DD]. When he was unable to locate the $1,700 [E] check in his briefcase, he first assumed it likely that it had also been cashed in [DD]. Respondent knew that his secretary had access to the checks and had a boyfriend who traveled as a truck driver. Added to this was the fact that his secretary had apparently been sent home from the office on June 5, 1980, and it appeared that the other partners suspected her of wrongdoing. In addition, [Y] had disappeared and respondent was unable to reach her. This was compounded by respondent's belief that the $1,700 check had disappeared from his briefcase, where he had last seen it. Although it was ultimately established that respondent had himself cashed the $1,700 check on April 24, 1980, respondent had no recollection of that event and was unaware that such was the situation. All of these events caused respondent to be more concerned for his secretary's involvement in the disappearance of the checks than for his own personal involvement, which he believed to be capable of explanation because it extended no further than his decision and instructions to his secretary to withhold checks as they arrived.

Respondent said it was this misconception which led respondent to approach [X], Esq. in an attempt to devise a plan to protect his secretary. He was convinced that his secretary had taken both of these checks.

Respondent approached him and informed him

that his secretary was being accused of having misappropriated some checks. Respondent explained the basis for this suspicion by explaining that [Y's] boyfriend, an over-the-road trucker, could be involved. As a result, [X] issued a letter and a check for $1,000, indicating that he had participated in the [E] case, was retaining $700 as his fee, and was forwarding the remaining $1,000 to the firm.

These events apparently transpired over the weekend during the time in which respondent was unable to reach [Y] by telephone. She had left the office on the afternoon of Thursday, June 5, 1980.

Respondent's decision to involve [X] only concerned the $1,700 [E] check.

Respondent said that he concluded over the weekend that his wife had inadvertently deposited the $5,000 [A]/[B] check and that his secretary had been responsible for the disappearance of the [E] check. He then returned to his office on Monday, June 9, 1980, and informed the other partners of these conclusions.

Respondent was unable to give an immediate explanation of the deposit of the $5,000 check because an examination of his records failed to reveal a $5,000 deposit which he was looking for specifically. His investigation finally revealed a deposit of $6,684.75, which consisted of the $5,000 [A]/[B] check, a $1,250 fee in *Commonwealth v. [A]*, and the $434 [D] fee. This is why it was not apparent upon initial examination. As soon as respondent made this discovery, he wrote a personal check for $1,684.75, which represented a reimbursement to the firm of the fees in *Commonwealth v. [A] and [D]*.

[N] and [M] met with respondent on June 16, 1980, to negotiate the terms of a severance agreement. At that time, [T] had received the $1,684.25 check from [respondent] as repayment of the money

in *Commonwealth v. [A] and [D].* Up to that point, the firm had no knowledge of these fees. [Respondent] explained that the money had been inadvertently deposited in his and his wife's account. The $5,000 fee in [A]/[B] was also paid and included in the severance agreement payment.

The partnership agreement provided for three major methods of terminating a partner's interest in the partnership:

(1) Permanent Withdrawal of the Partner (Article V, section D, page 15). This method of severance provided for a system of debits and credits between the withdrawing partner and the continuing firm. The major feature of this provision was that the withdrawing partner would be entitled to take with him all files and documents pertaining to his clients. This was the procedure followed by respondent and the firm in the negotiation and execution of the June 16, 1980 severance agreement.

(2) Expulsion of a Partner — Expulsion for Cause. A partner could be expelled for causes enumerated in section G, sub-paragraph 1(a) through 1(f), inclusive. The enumerated clauses include the type of alleged professional misconduct which is the subject of this complaint.

(3) Expulsion Without Determining Any Cause. A partner could be expelled for any reason without determining any cause for expulsion. The effects of expulsion for cause and without determining cause are substantially the same. The most significant effect is that the expelled partner shall not be entitled to any interest in any of the firm assets, clients, files or records.

This document is significant because it substantiates that when the severance agreement was executed on June 16, 1980, the complainants, although they knew all of the facts set forth in

charges I, II and III, did not attempt to expel respondent. Instead, they accepted payment of $34,290, which included reimbursement of all of the sums which are the subject of counts I, II and III. Since the complainants filed their complaint only after respondent established a successful practice, it tends to show that the motivation for filing the complaint was economic and vindictive.

### The [F] Matter

This board, like the hearing committee, finds that the monies paid to respondent by [ ] and [ ] [F] on behalf of their various business enterprises were retainers and that under the provisions of the partnership agreement, respondent was entitled to keep such retainers without further accounting for or payment over to the firm. Therefore, there can be no violation of the disciplinary rules.

### The [G] Matter

Respondent had represented [G] in a personal injury claim which was settled for the sum of $10,000. The firm was entitled to receive a fee of 30 percent of the gross settlement, plus costs.

On November 25, 1977, respondent instructed the bookkeeper to prepare two checks to [G], one for $6,882.90 as his distributive share of the settlement and one for $500. [G] then cashed the $500 check and returned the cash to the reception desk at the firm, where he was given a written receipt for the sum of $500 by respondent's secretary. A carbon copy of the receipt was retained in the records of the firm.

Respondent testified that he was the "token Democrat" in the firm and that he, but not the firm, made contributions to Democratic candidates. Respondent testified that he informed [T] exactly what

he was doing and that his retention of the $500 was "reimbursement" for political contributions which he had made to Democratic candidates. Respondent explained that he had no intent to convert the funds for an improper purpose.

Finally, and perhaps most compelling, is the fact that when the parties negotiated and executed the severance agreement in this case, they also executed *mutual* releases. After the settlement of the dispute, this complaint was filed.

The releases mentioned above would fully resolve this matter, were it not for the events that followed the confrontation in the [E] matter. This board, as did the hearing committee, finds that respondent's explanation stretched one's imagination to the fullest degree. It is because of the lack of credibility of the explanation, albeit good intentions, that we cannot recommend dismissal of all the charges.

## CONCLUSIONS OF LAW

As to charges I, II, IV and V this board finds no violation of the disciplinary rules.

As to charge III, this board finds that as to the subsequent explanation regarding the [E] check respondent violated the following disciplinary rules:

D.R. 1-102(A)(5);
D.R. 1-102(A)(6).

## CONCLUSION

In consideration of the foregoing, the disciplinary board of the Supreme Court determines that a private reprimand should be administered in connection with this case for violation of the disciplinary rules above cited on charge III, pursuant to rule 208(d)(2)(ii). Charges I, II, IV and V should be dismissed.

Respondent shall bear the costs of these proceedings pursuant to rule 208(g)(2) on or before the date fixed for the appearance of respondent before the Disciplinary Board for the administration of the private reprimand.

## ORDER

And now, this April 10, 1987, upon consideration of the report and recommendation of Hearing Committee [ ] dated January 20, 1986; it is ordered and decreed that the said [respondent] of [ ] County, be subjected to private reprimand by the Disciplinary Board of the Supreme Court of Pennsylvania as provided in rule 204(a)(5) of the Pennsylvania Rules of Disciplinary Enforcement at the next session of this board in connection with charge III of the petition for discipline. Charges I, II, IV and V are dismissed. Costs are to be paid by respondent.